67 N.J. Super. 483 (1961)
171 A.2d 124
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROY W. ARNWINE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 6, 1961.
Decided May 15, 1961.
*484 Before Judges GOLDMANN, FOLEY and LEWIS.
Mr. Emerson L. Darnell, court-assigned counsel, argued the cause for defendant-appellant.
Mr. Martin J. Queenan, Burlington County Prosecutor, argued the cause for plaintiff-respondent.
The opinion of the court was delivered by LEWIS, J.A.D.
Defendant, Roy W. Arnwine, was indicted under N.J.S. 2A:114-2 for incestuous conduct between parent and child. Following a plea of not guilty he was tried and convicted by a jury before the Superior Court, Criminal Division, Burlington County, and was sentenced to a prison term of not less than three nor more than five years. Acting pro se, he filed notice of appeal, proceeded under R.R. 1:2-7(a) as an indigent appellant, and was assigned counsel.
The appeal is predicated upon seven contentions asserted by the defendant, five of which were abandoned by his court-assigned counsel as not being supported by the record. We shall, accordingly, only consider the two questions that were argued before this court which are, as stated in counsel's brief:
(1) Was the manner in which the prosecutor propounded questions to the defendant so prejudicial as to constitute plain error affecting defendant's substantial rights?
*485 (2) Were the results of the polygraph test taken by the defendant admitted into evidence indirectly? If so, was this reversible error?
Detective John P. Mc Gann, a member of the New Jersey State Police, testified that when he confronted defendant with a statement of his daughter Sandra, aged 12, charging him with incestuous conduct he replied: "If she says that, probably it happened." Defendant later denied the allegations in the statement; he also denied he had ever admitted to any of the acts charged, and he pleaded not guilty. The daughter Sandra also denied the facts and charges made in her statement. She not only denied them to her mother, but on three occasions told defendant's counsel that they were not true, and she denied their truth before the grand jury. At the trial, however, she said they were true. The sordid details of the alleged crime need not here be reviewed as our inquiry will be addressed to the disputed developments during the course of the trial.

I.
Defendant challenges the manner of the prosecutor's cross-examination of him in the following interrogation:
"Q. Mr. Arnwine, in 1940 were you convicted of the crime of atrocious assault and battery and rape? A. No sir.
Q. Attempted rape? A. No sir.
Q. In Mays Landing? A. No.
Q. Your answer is no? A. Yes. I was convicted of assault and battery. The attempted rape was dropped.
Q. You are sure about that? A. Positive.
Q. That is your testimony? A. Yes.
Q. All right. In 1944 were you convicted of the crime of grand larceny? A. Yes, sir.
Q. In 1933, were you convicted of larceny of an automobile? A. That is too far back for me to remember.
Q. You don't remember whether you were ever convicted in 1933 of larceny of an automobile? A. I don't remember what year I was arrested.
Q. Did you ever steal a car? A. Yes.
Q. Now, in 1955, were you convicted in this County of larceny? A. Yes." (Emphasis added)
*486 When the defendant took the witness stand he invited inquiry into his criminal record, and the prosecutor had the right to explore into that record for the purpose of affecting the witness' credibility, either through the process of examination or by the medium of producing the record itself. This right is authorized by N.J.S. 2A:81-12. The statute permits proof of convictions as distinguished from proof of indictments, charges and complaints.
To affect credibility the State may prove prior convictions, and to that end may interrogate the witness. The prosecutor is not at liberty, however, to employ questions to create a false premise for consideration of the jury. State v. Cooper, 10 N.J. 532, 555 (1952); State v. Nagy, 27 N.J. Super. 1 (App. Div. 1953); 8 Wigmore, Evidence (3d ed. 1940), sec. 2276(2).
We have no doubt that the prosecutor may have believed that defendant had been convicted of rape or attempted rape as his questions implied. However, his impression in this respect was erroneous, as a check of the defendant's F.B.I. records would have undoubtedly demonstrated. Defendant suffered a manifest injury which was directly attributable to the manner of the prosecutor's questioning. His answer that "the attempted rape charge was dropped" was a concession that he had once been charged with attempted rape, a matter which plainly prosecutor was not entitled to prove. This information was volunteered by defendant in explanation of his categorical denial that he had been convicted of rape or attempted rape. But it was given only after he had been repeatedly pressed by the prosecutor for an admission that he had been so convicted.
The defendant was on trial for a reprehensible and revolting sex crime. The very fact that the charge originated in the mouth of his 12-year-old daughter placed him in great jeopardy. The cross-examination as to the defendant's having been convicted of rape or attempted rape was in the same area of a serious sex offense as the one with which he stood charged. Through no fault of his own, *487 defendant under relentless inquiry was obliged to disclose that he had previously been charged with another sex offense. We are strongly of the view that this prior charge may have, in the minds of the jury, lent color to the truth of the charge on which defendant was standing trial. It seriously prejudiced his case and amounted to plain error.

II.
Defendant voluntarily submitted to a polygraph test. The record of the trial below is barren of any effort to lay a foundation with respect to the equipment used or to establish the technical qualifications of Detective John Latawiec, the polygraph examiner, other than the fact that he was a sergeant associated, as such an examiner, with the New Jersey State Police. The prosecution agreed that since there was no agreement that the polygraph findings could be used in evidence, they were not admissible. The trial court accordingly properly excluded direct testimony as to the results of the polygraph test. However, subsequent events nullified the effectiveness of this ruling.
Detective Latawiec was permitted to testify that he gave defendant a so-called "lie-detector" examination which lasted approximately 40 minutes. Defendant was connected with the polygraph during all that time; the apparatus was turned on only during a 3 1/2-minute test period. The testimony of the examiner included questions propounded to, and the answers of, defendant before and after the short period the polygraph machine was turned on. He testified that he made written notes during the examination and that defendant was then advised as to the results. Following this, and while defendant was still connected to the instrument, Latawiec asked him if he had done this to Sandra and defendant said: "If Sandra said I did this, I probably did it." Defendant urges, and we agree, that the jury was thus indirectly apprised of the results of the test. Under cross-examination the examiner admitted that defendant had *488 denied the charges against him and that he, the examiner, "* * * didn't write anything about denials."
It is apparent that during the course of the trial the court and respective counsel proceeded on the assumption that the actual results of the polygraph examination would be admissible only if the parties consented thereto,  and they had not. On the other hand, all assumed that the details of the examination, the res gestae so to speak, excluding the actual results, would be evidential. Without objection, the prosecutor in his closing summation to the jury remarked:
"* * * he was given that lie detector test. Under our law, the only way the results can be put into evidence is by defense counsel consenting that they go in. Even if I consent to them going in, the only way they can go in evidence, there hasn't been mutual consent."
Obviously, the jurors were impregnated with the result of the test which had been indirectly disclosed to them, and they had a well-planted impression that the defendant was unwilling to consent to the admission of self-incriminating evidence.
The prosecutor, during the oral argument on appeal, with commendable frankness admitted the uncertainty of the law in New Jersey respecting the admissibility of evidence relative to the use and results of a polygraph test. He urges this court, for the benefit of not only the parties litigant but to assist trial courts, to resolve some of the prevailing uncertainties.
There is a dearth of legal authority in New Jersey dealing with mechanical means of ascertaining the truth or validity of testimony. The only reported decision is State v. Emery, 27 N.J. 348, 356 (1958), wherein the issue was not the admissibility of a polygraph test or the examiner's findings as evidence, but rather the question of admitting test results as "newly discovered" evidence, asserted as a basis for a trial de novo. The Supreme Court decision recognized that polygraph *489 examinations are not infallible tests of truth or deception, and it was judicially observed:
"They must be interpreted in order to have any meaning. It is conceded that their probative value hinges upon the competence of the expert who administers and reads them." Citing McCormick, Evidence, sec. 174 (1954).
We are called upon to determine if it is prejudicial error, in a criminal proceeding, to admit into evidence indirectly the results of a polygraph examination to which the defendant has voluntarily submitted. The advisability of reviewing foreign authorities is indicated, since other jurisdictions have enforced variant rules on the general subject, and this impels us to consider such determinations and to adopt what we conceive to be the appropriate view. Faulkner v. Martin, 133 N.J.L. 605 (E. & A. 1945). Cf. Ryan v. Public Service Co-ordinated Transport, 18 N.J. Misc. 429 (Sup. Ct. 1940).
Before referring to the numerous sister-state decisions involving the use of the polygraph and the problems of admissible evidence, we should in limine, but briefly, observe the nature and technique of mechanical devices or scientific instruments used for the detecting of deception and the ascertainment of truth, the objective of all trial practice. While such a review may not be necessary to the decision of the matter in controversy, it may, however, shed some light that may be helpful in understanding the rationale of the judicial decisions.
The late Dean Wigmore has commented:
"If there ever is devised a psychological test for the evaluation of witnesses, the law will run to meet it." 3 Wigmore, Evidence (3d ed. 1940), sec. 875, p. 368; 29 Cornell L.Q. 535 (1944).
Our Supreme Court has been ever alert to accord judicial recognition to scientific discoveries when buttressed by adequate knowledge, proven accuracy and established trustworthiness. Justice Jacobs, in State v. Dantonio, 18 N.J. *490 570 (1955), assembled a number of authorities and legal publications evidencing over the years the trend of judicial acceptance of such scientific discoveries, devices and methods as the tachograph, fingerprinting equipment, X-ray skiagrams, cardiographs, radar speedometers, blood grouping tests, and the like. In short, the effectiveness and general recognition of the art must precede judicial notice. Cf. State v. Sinnott, 24 N.J. 408 (1957), for an extensive review of the law respecting the so-called "truth sera" which "does not necessarily produce the truth"; see, also, State v. Miller, 64 N.J. Super. 262 (App. Div. 1960), holding that the drunkometer is sufficiently established and accepted as a scientifically reliable and accurate device for determining the alcoholic content of the blood. Want of foundation testimony, however, was fatal in that case.
The polygraph machine itself is sometimes known as a lie-detector (technically a misnomer), a pathometer, or a psychogalvanometer. It is, in fact, nothing more nor less than a mechanical instrument for the recording of physiological processes which are considered affected by conscious lying. The standard polygraph today contains units for the purpose of recording blood pressure-pulse, respiration and galvanic skin reflex. An additional unit is also available for detecting otherwise unobservable muscular movements and pressures. Not all so-called "lie-detector" devices are capable of maximum efficiency. The possibility of basic misconceptions concerning any such mechanism would obviously require an adequate foundation before the admission of testimony with relation to its use. Furthermore, as recognized by our Supreme Court, State v. Emery, supra, the recording of the polygraph "* * * must be interpreted in order to have any meaning."
While the actual operation of the instrument itself would require comparatively little ability or training, the conducting of the examination, pre-test interviews, developing control questions, handling of inquiries, skillful interrogation, interpretation of various recordings, coordinating information, *491 diagnosing data, determining findings and arriving at conclusions would indeed require someone of special intelligence, training and experience. Obviously, the operator or examiner using a technical instrument in examining a person and offering his skill to interpret the results of that examination should be an expert and qualify as such before his testimony is admissible. As a matter of general evidence law, a preliminary question of competency is involved which should be passed upon by the trial judge after judicial inquiry into the examiner's qualifications. Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 141 (1950); Carbone v. Warburton, 22 N.J. Super. 5 (App. Div. 1952), affirmed 11 N.J. 418 (1953); Cowdrick v. Pennsylvania R.R. Co., 132 N.J.L. 131, 139 (E. & A. 1944), certiorari denied 323 U.S. 799, 65 S.Ct. 555, 89 L.Ed. 637 (1945); Electric Park Amusement Co. v. Psichos, 83 N.J.L. 262 (Sup. Ct. 1912); New Jersey Zinc & Iron Co. v. Lehigh Zinc & Iron Co., 59 N.J.L. 189, 194 (E. & A. 1896); 23 C.J.S. Criminal Law § 967, p. 295 (Experiments and Tests); 20 Am. Jur., Evidence, sec. 762, p. 633; 2 Wigmore, Evidence (3d ed. 1940), secs. 560, 561, pp. 640, 641.
Fred E. Inbau, Professor of Law and former Director of the Chicago Police Scientific Crime Detection Laboratory, is a specialist in this scientific field, and for a short and lucid explanation of the technique and use of the polygraph see his articles, "Scientific Evidence in Criminal Cases: Methods of Detecting Deception; The Lie Detector," 24 J. of Crim. L. and Criminology 1140 (1934); and "Detection of Deception Technique Admitted as Evidence," 26 Ibid. 262 (1935). For a current and more detailed disertation, refer to the work of Inbau and Reid, Lie Detection and Criminal Interrogation (1953) wherein the authors, at pages 65 and 66, outline and illustrate various factors occasioning difficulties in the diagnosis of deception by the lie-detector technique, listing numerous such factors under the following major classifications: (1) nervousness or extreme emotional tension; (2) physiological abnormalities; *492 (3) mental abnormalities; (4) unresponsiveness in a lying or guilty subject; (5) attempts to "beat the machine" by controlled or by muscular flexing; and (6) unobserved application of muscular pressures. On the broad subject of lie-detector limitations, see the comments of Professor Inbau presented at the 62nd Annual Conference, International Association of Chiefs of Police, October 1955, reprinted in 2 Journal of Forensic Sciences 255 (1957); also Floch, "Limitations of the Lie Detector," 40 J. of Crim. L. and Criminology 651 (1950).
It has been estimated that polygraph tests have proven correct in approximately 75% of the cases used, the aforementioned factors being responsible for an estimated 25% of failures. Henderson v. State, 94 Okl. Cr. 45, 230 P.2d 495, 501, 23 A.L.R.2d 1300, and references therein to 8 Fed. B.J., Jan. 1947. More recent statistics indicate improvements in the art and greater accuracy in the application of the scientific technique. Richard O. Arther, Director of Scientific Lie-Detector Inc., New York City, wrote an article entitled "The Lie Detector  Has it any Value," published in December 1960, wherein, referring to the polygraph, he expressed the opinion that "It is only as reliable and valuable as the examiner. It must be remembered that there are few truly competent examiners." In the 7400 actual cases he studied over the past seven years the polygraph technique was reported to have a 95% accuracy, with less than a 4% margin of indefinite (inconclusive) determinations and a 1% margin of maximum possible error. His conclusions can be summarized:
"Regardless of what one reads, there is not one trustworthy device which can detect lies or truth by the swing of a dial needle. * * * There are, however, reliable and valid instruments termed `polygraphs' which record several physiological changes. * * * All these changes can be interpreted  but only by an expert  as indicating either truth or falsehood." 24 Fed. Probation 36 (Dec. 1960).
This margin of error, whatever it be, bespeaks with emphasis the reason why our courts should be hesitant to accept such *493 test results in criminal proceedings and should lend adherence to the adage ex abundanti cautela.
The first reported case repudiating the use of the polygraph as evidence in a criminal trial is Frye v. United States, 54 App. D.C. 46, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C. Ct. App. 1923), which involved a defendant who submitted to the mechanical deception test and offered the scientist who conducted it as an expert to testify to the results obtained. The trial court sustained the objection to the offer, and upon appeal the court affirmed, saying:
"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while the courts will go a long way in admitting expert testimony deducted from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.
We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made."
Parenthetically, it is worthy of note, albeit ironic, that Frye, the defendant in the foregoing case, was sentenced to life imprisonment. The blood-pressure deception test indicated his innocence, and this was subsequently corroborated when a third person confessed that he was the real murderer. Had the results of the test been admissible evidence, it is altogether probable that an innocent man would not have been convicted of murder. 14th Annual Report of the New York Judicial Council 265 (1948); 22 Tenn. L. Rev. 711, 715 (1953).
In a later case, State v. Bohner, 210 Wis. 651, 246 N.W. 314, 317, 86 A.L.R. 611 (1933) (robbery), the Supreme Court of Wisconsin commented in effect that it was not satisfied that, during the elapse of ten years since the Frye decision, the polygraph instrument had progressed from the *494 experimental to the demonstrable state, the court commenting:
"The present necessity for elaborate exposition of its theory and demonstration of its practical working in order to convince the jury of its probative tendencies, together with possibility of attacks upon the soundness of its underlying theory and its practical usefulness, may easily result in the trial of the lie detector rather than the issues in the cause." (Emphasis supplied)
Subsequent cases similarly excluding the admissibility of the results of a polygraph test include: People v. Becker, 300 Mich. 562, 2 N.W.2d 503, 505, 139 A.L.R. 1171 (Sup. Ct. 1942) (manslaughter), the court ruling: "There was no testimony offered which would indicate that there is at this time (1942) a general scientific recognition of such tests"; State v. Lowry, 163 Kan. 622, 185 P.2d 147, 150 (Sup. Ct. 1947), an interesting case because the defendant and the prosecuting witnesses at the suggestion of the trial court submitted to the polygraph test, the defendant was convicted and on appeal the conviction was reversed; the reviewing court referred to the polygraph as a mechanical device, a witness in absentia, that raised a constitutional impediment as to the vital function of cross-examination  the machine escapes such an examination. See, also, Henderson v. State, 94 Okl. Cr. 45, 230 P.2d 495, 23 A.L.R.2d 1292 (Crim. App. 1951), certiorari denied 342 U.S. 898, 72 S.Ct. 234, 96 L.Ed. 673 (1951) (rape), and which an exhaustive opinion was rendered; State v. Pusch, 77 N.D. 860, 46 N.W.2d 508 (Sup. Ct. 1951) (murder); Hawkins v. State, 222 Miss. 753, 77 So.2d 263 (Sup. Ct. 1955) (attempted rape); Peterson v. State, 157 Tex. Cr. 255, 247 S.W.2d 110, 248 S.W.2d 130 (Crim. App. 1952) (passing forged instrument); Colbert v. Com. Ky., 306 S.W.2d 825, 71 A.L.R.2d 442 (Ky. Ct. App. 1957) (armed robbery); Lee v. Commonwealth, 200 Va. 233, 105 S.E.2d 152 (Sup. Ct. App. 1958) (petit larceny); Marks v. United States, 260 F.2d 377 (10 Cir. 1958), certiorari denied 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d *495 302 (1959) (bribery); 3 Wigmore, Evidence (3d ed. 1940), sec. 999, p. 644; Annotation 23 A.L.R.2d 1292, 1306 (1952); McCormick, Evidence, sec. 174, p. 369; 1 Conrad Modern Trial, Evidence, sec. 714, p. 602 (1956). See, also, Conrad, "Psychiatric Lie Detection, The Federal Courts' Break with Tradition," 21 F.R.D. 199 (1957).
It is significant that there is not a single reported decision where an appellate court has permitted the introduction of the results of a polygraph or lie-detector test as evidence in the absence of a sanctioning agreement or stipulation between the parties. A few reported trial court opinions have supported the admissibility theory, the outstanding illustration being the New York case of People v. Kenny, 167 Misc. 51, 3 N.Y.S.2d 348, 350 (Cty. Ct. 1938) (robbery). The defendant in that case submitted to the test, offering the findings of the examiner into evidence. It was reported to the court by the operator of the polygraph that the results of its use "indicated 100 per cent. accuracy." The court was undoubtedly influenced by such an unverified representation. The results of the test were admitted, but an appeal was never pursued. As a New York precedent, this Kenny decision has lost its effectiveness since People v. Forte, 279 N.Y. 204, 206, 18 N.E.2d 31, 32, 119 A.L.R. 1198 (Ct. App. 1938) (murder). The New York Court of Appeals there affirmed the trial court which had denied a motion to subject defendant to a pathometer test, maintaining that the results would be inadmissible in evidence. The appellate tribunal, in affirming, commented:
"Can it be depended upon to operate with complete success on persons of varying emotional stability? The record is devoid of evidence tending to show a general scientific recognition that the pathometer possesses efficacy."
If the results of a polygraph test are not admissible evidence by direct testimony, any effort, design or circumstance that would accomplish such an objective indirectly or inferentially, as here, should not be condoned. The prejudicial *496 error would be ever present. In People v. Wochnick, 98 Cal. App.2d 124, 219 P.2d 70, 73 (D. Ct. App. 1950) (murder), the results of the test were not placed before the jury  only the conversation between the defendant and the police officers during the time and the occasion of the test. Moreover, the trial court specifically instructed the jury it could not consider that portion of the conversation relating to the lie-detector test as indicating whether or not there was any reaction to any technical phase of the test. The reviewing court found prejudicial error, concluding: "* * * this testimony placed before the jury the result of the detector test, which in itself was inadmissible * * *." Where the testimony is designed to leave inferences of lying by offering to admit results, or indirectly informing the jury thereof, the rights of the defendant to a fair trial have been materially affected. Leeks v. State, 95 Okl. Cr. 326, 245 P.2d 764 (Crim. App. 1952) (murder). The fact that the exact results were not testified to does not correct the error. People v. Welke, 342 Mich. 164, 68 N.W.2d 759 (Sup. Ct. 1955) (extortion).
It may be noted that where a defendant in a criminal case has applied to the court by motion for the right to be administered a lie-detector test, the prevailing authorities have sustained the denial of such motions. State v. Cole, 354 Mo. 181, 188 S.W.2d 43, 189 S.W.2d 541 (Sup. Ct. 1945) (murder); State v. Stidham, 305 S.W.2d 7 (Mo. Sup. Ct. 1957) (murder). It is likewise inadmissible to show willingness to take such a test, Commonwealth v. Saunders, 386 Pa. 149, 125 A.2d 442 (Sup. Ct. 1956) (murder); and in State v. Kolander, 236 Minn. 209, 52 N.W.2d 458 (Sup. Ct. 1952) (arson), refusal to take an examination was held to be inadmissible since refusal cannot be considered an issue of consciousness of guilt, and the admission of such testimony was reversible error. The same principle had been applied to witnesses other than a defendant. In Kaminski v. State, 63 So.2d 339 (Fla. Sup. Ct. 1953) (assault with intent to murder), a statement by *497 the prosecutor to the effect that the prosecuting witness voluntarily submitted to a lie-detector test was inadmissible, and in People v. Carter, 48 Cal.2d 737, 312 P.2d 665 (Sup. Ct. 1957) (murder), it was adjudged that the trial court erred in not excluding testimony that an important witness was willing to take a lie-detector test which "some others won't take." Although stricken from the record, the implication was there that the defendant would not take the test, hence reversible error was adjudged. See, also, Lusby v. State, 217 Md. 191, 141 A.2d 893 (Ct. App. 1958), where by the prompt action of the judge in sustaining an objection and properly instructing the jury a mistrial was avoided. Admissibility has, however, been recognized as a step leading up to a confession on the limited issue of voluntariness. Tyler v. United States, 90 U.S. App. D.C. 2, 193 F.2d 24 (D.C. Cir. 1951), certiorari denied 343 U.S. 908, 72 S.Ct. 639, 96 L.Ed. 1326 (1952); State v. De Hart, 242 Wis. 562, 8 N.W.2d 360 (Sup. Ct. 1943).
The leading case supporting the proposition of admissibility of test results upon consent and stipulation is People v. Houser, 85 Cal. App.2d 686, 193 P.2d 937 (D. Ct. App. 1948), and should be read in conjunction with Boeche v. State, 151 Neb. 368, 37 N.W.2d 593 (Sup. Ct. 1949), which embraced a stipulation by defendant that was adjudged not to be binding upon the court, and the results of the polygraph examination, notwithstanding his agreement, were not admitted into evidence. Three judges rendered a minority opinion to the effect that, if the expert examiner had been duly qualified, and if there were adequate foundation of proof of the scientific soundness of the test furnished, the evidence would have been admissible. Cf. Le Fevre v. State, 242 Wis. 416, 8 N.W.2d 288 (Sup. Ct. 1943). An interesting civil case is worthy of note, Stone v. Earp, 331 Mich. 606, 50 N.W.2d 172, 174 (Sup. Ct. 1951). The trial judge in that chancery suit took the position with counsel: "I am not going to decide this case until your clients take a lie-detector test." Both parties agreed, and *498 the test disclosed that the plaintiff was lying. Upon appeal, the plaintiff contended that the court below erred in placing reliance upon the results of the lie-detector test. The Supreme Court of Michigan concurred and held the trial court did err, saying:
"We are not unmindful of the fact that at the direction of the trial court, the parties agreed to submit to the test, but whether by voluntary agreement, court direction, or coercion, the results of such tests do not attain the stature of competent evidence."
The lower court, however, was not reversed as the preponderance of the other evidence in support of the conclusion reached overcame the prejudicial results of the objectionable test.
The prevailing authorities have been consistent, in criminal proceedings, in their refusal to admit into evidence, directly or indirectly, the results of a test accompanied by the use of the polygraph, lie-detector or similar mechanical device for the detection of truth or deception. These scientific instrumentalities of proof have not yet attained sufficient accuracy and reliability for judicial acceptance of their test results. Departure from this established principle has been justified only under limited circumstances, such as, where the defendant and the state have stipulated and consented in writing to the admissibility of such evidence; and then only subject to the approval of the trial judge after determining that a proper foundation has been laid, that the expert examiner has been duly qualified, and that the fundamental rights of the defendant have been duly safeguarded.
If we give these precepts juristic sanction and apply them to the case sub judice, we reach the inescapable conclusion that the defendant was prejudiced in the eyes of the jury when Detective Latawiec was permitted to testify that defendant, while attached to the polygraph machine and after being informed of the results of the test, said, "If Sandra said I did this, I probably did it." This testimony *499 had the potential of conveying to the jury, if it did not in fact convey, the conclusion that the polygraph results were unfavorable to the accused.
Reversed and remanded for new trial.
FOLEY, J.A.D. (concurring).
I am in accord with the holding of the majority that defendant suffered manifest prejudice as a result of the cross-examination concerning his criminal record. Likewise, I concur in the conclusion that defendant's fundamental right to a fair trial was invaded when the State was permitted to indirectly get before the jury the results of a polygraph test, although, concededly, the results of the test were not admissible in the circumstances of this case.
But because the issue of the admissibility of such results was not before us I am unwilling to spell out generally, and for future guidance, the foundation of proof required to make the test results evidential. It seems to me that this should await a case in which the issue is squarely raised so that the decision therein may be construed in light of a live, rather than a hypothetical, factual complex.
It is my view that dicta are to be avoided as far as possible and should be employed only where they serve to illuminate the holding in a case. I think that this is particularly true when the dicta involve a discussion of the present status of scientific information as it affects the law. The pace of research in science is so swift, and the impulse of those engaged in this field is so dynamic that the artisans of the law would be well advised to avoid fixing standards unnecessarily, which in future application may be found to be based on scientific concepts which are then outmoded. Compare, e.g., State v. Hunter, 4 N.J. Super. 531, 538 (App. Div. 1949), with State v. Miller, 64 N.J. Super. 262, 269-270 (App. Div. 1960). And note in Miller the observation of the court that because of the "continuing changes" in Drunkometer technique that it would "be unwise * * * to attempt to specify precisely what proof the State must *500 adduce before the technician who gave the test may testify as to the reading." 64 N.J. Super., at page 270.