266 So.2d 310

**John Clifford GRACE, alias**

**v.**

**STATE.**

**7 Div. 120.**

Court of Criminal Appeals of Alabama.

May 30, 1972.

On Rehearing July 12, 1972.

Rehearing Denied Aug. 1, 1972.

Burns, Carr & Shumaker, Centre, for appellant.

William J. Baxley, Atty. Gen., and Herbert H. Henry, Asst. Atty. Gen., for the State.

PRICE, Presiding Judge.

Appellant, John Clifford Grace, stands convicted of murder in the second degree. His punishment was fixed at ten years in the penitentiary.

The evidence tends to show that during the evening of October 4, 1970, the deceased, Henry Grady Benson, and defendant were at the home of Coleman Gossett, in Centre, Alabama. State's witness Gossett testified the three men were drinking whiskey; that he sat on the bed and went to sleep about seven o'clock. Defendant and deceased were still in the room. When he awoke around midnight Benson was lying on the floor of the room, dead. The witness stated there had been no arguing or cross words between the defendant and deceased and he did not hear a rifle fire.

The state toxicologist testified he performed an analysis on a blood sample taken from the body of deceased, which revealed ethyl alcohol content of 0.48 percent. An individual with this percentage of alcohol would have been in an extreme stage of alcoholic intoxication. This stage is represented by complete absence of reflexes, coma and unconsciousness and on occasions death occurs. In other words, he was "passed out" drunk.

The toxicologist testified death was caused by a gunshot wound in the chest,

the bullet passing through the left chest cavity, damaging the heart, resulting in massive hemorrhage. In the left back there was a hole which measured approximately a quarter of an inch in diameter, located two inches to the left midline of the body, four inches below the level of the armpit. On the left side, or lateral surface of the hip there was a rather oval wound. Immediately forward of this there was a very superficial abrasion and then two inches back of, or posterior to this puncture wound in the hip, was another wound in the lateral surface of the left buttock. The wound in the chest was consistent with one formed by the entry of a .22 caliber rifle bullet. Presumably, from the photograph of the body, the wound in the back was the exit wound. No bullets were removed from the body. There was a spent bullet on the floor of the room adjacent to the room where the body was found. The bullet went through a corner of the wall.

Mrs. Lucinda Hicks, who lived across the street from Gossett, testified she heard a sound like a rifle shot at Gossett's about 8:30 and in a few minutes heard a car drive away.

State Investigator Riddle found two bullet holes and four spent twenty-two caliber rifle hulls on the sofa.

Jerry Buttram testified he saw defendant around ten o'clock. He was sitting in his car in witness' yard. He was drunk, foaming at the mouth and his speech was slurred. When witness asked him to leave he drove away. Shortly afterwards the police answered a call and found defendant's car in the middle of the road with defendant slumped over the steering wheel. He was intoxicated and had whiskey in his car.

The state introduced two written statements purportedly signed by the defendant. In the first statement made at the Centre jail on October 5, 1970, the defendant denied shooting the deceased.

In the second statement made October 9, 1970, at Montgomery, the defendant said he left Gossett's and went home but no one was there and he went back to Gossett's to pick up his rifle he had left there. Benson was sitting on the sofa and Coleman Gossett was sitting on the bed. When he picked up his rifle, a 22 caliber automatic, it went off. The first shot struck Benson in the chest area and he fell on the floor. Gossett didn't say a word and neither did Benson. Defendant got scared and threw the rifle down and it fired several times. He ran and got in his car and left. When the car stopped he went to sleep. The three men were drinking together, but they were not fussing or having any trouble.

The toxicologist testified he test fired the rifle identified as State's Exhibit 9 at the firing range; that he fired approximately twenty-five to thirty-five rounds of ammunition from it of varying rates of trigger pull to check it for malfunction of operation and during that time, with the weapon loaded he slammed it into the ground; bumped and abused it to check the retard safety mechanism and that it did not fire. It is an automatic loading weapon and semi-automatic in terms of firing capabilities, which means that for each time it fires the trigger must be pulled one time, as opposed to automatic when the trigger is held down and it continues to fire until empty. On cross examination the witness stated he could not force the gun to go off, but he would not say it would not go off.

The defendant contends the court committed reversible error in admitting the second statement on the ground it was involuntary.

At the bottom of the first statement there appears the notation, "I am willing to take the polygraph test, the lie detector test to prove my innocence." On voir dire examination state's investigator Roy Riddle testified the reason for defendant's presence in Montgomery was to take a lie detector test. He told defendant that in his

opinion the lie detector test would prove his guilt or innocence. He did not in so many words tell defendant it was his opinion that if he took the lie detector test and it did show he was innocent, charges would be dropped against him, but it is possible defendant was led to believe this would be the facts in this situation. He told defendant he did not have to take the lie detector test, but defendant said he wanted to take the test.

In Johnson v. State, (Fla.App.) 1964, 166 So.2d 798, the court stated:

"Perhaps the most frequent instances of a jury being advised of a defendant's having taken a lie detector test are in cases involving confessions or admissions procured in anticipation of, during or subsequent to administration of a lie detector examination. It is well established that the mere fact that a lie detector examination may have been involved in procuring a confession does not render the confession inadmissible. (citing cases) However, if the defendant is forced to submit to the examination or if the methods of examination are such as to constitute actual or psychological coercion the resulting confession may well be found involuntary."

The defendant did not testify and no evidence was offered by him concerning the circumstances surrounding the confession. We are of opinion the statement of the officer that the lie detector test would prove his guilt or innocence did not constitute coercion so as to render the statement involuntary.

Murder in the second degree is the unlawful killing of a human being with malice, but without deliberation or premeditation. Title 14, § 314, Code 1940.

"Legal malice" as an ingredient of murder is an intent to take the life of another without legal excuse, justification or mitigation, and it may be presumed from the use of a deadly weapon, unless the evidence which proves the killing rebuts the presumption, Miller v. State, 38 Ala.App. 593, 90 So.2d 166.

Or, as was said by Bricken, P. J., in Barnett v. State, 21 Ala.App. 646, 111 So. 318, to be guilty of second degree murder defendant must have fired the fatal shot willfully, intentionally, and maliciously.

Fully recognizing that this intent to take life is an inference to be determined by the jury from the facts, and the question of whether defendant accidentally and unintentionally fired the fatal shot is ordinarily a question for the jury, nevertheless, we are convinced that no malice toward deceased is shown except that which is inferable from the use of the deadly weapon and the law says that this presumption does not obtain where "the circumstances of the killing disprove malice." Dixon v. State, 128 Ala. 54, 29 So. 623.

In the absence of malice there can be no conviction for murder in the second degree. Smith v. State, 31 Ala.App. 12, 11 So.2d 466.

In this case the defendant requested the general affirmative charge as to murder in the second degree. We are of opinion its refusal was error.

The judgment is ordered reversed and the cause remanded.

Reversed and remanded.

CATES and HARRIS, JJ., concur.

ALMON and TYSON, JJ., dissent.

CATES, Judge (concurring).

I consider that investigator Riddle's discussion with Grace regarding the infallibility of the polygraph (lie detector) test was an improper inducement to Grace's inculpatory admission.

The mere *voluntary* taking of such a test standing alone should not taint the confession. Duncan v. State, 278 Ala. 145, at 171, 176 So.2d 840. However, the result of

a test is not admissible against objection. Kaminski v. State, Fla., 63 So.2d 339; Wilcutt v. State, 41 Ala.App. 25, 123 So.2d 193.

But the agreement to submit thereto should not be motivated in any degree by a "statement" that a so-called exonerative outcome would dismiss the prosecution. See Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948.

I think the following quotation from Commonwealth v. Fatalo, 346 Mass. 266, 191 N.E.2d 479, is reflective of the reluctance of appellate courts to approve the admissibility of the results of polygraph testing:

"There is hardly a device which has caused greater controversy among 'experts,' lawyers, physicians, psychologists, government officials, and the public in general than the polygraph or 'lie-detector' as it is colloquially characterized. The question of the admissibility of the results of a 'lie-detector' test is one of first impression for this court. Such tests have been described and their judicial history chronicled by the courts of many other States. An excellent opinion for such purposes is State v. Valdez, 91 Ariz. 274, 371 P.2d 894. See 23 A.L.R.2d 1308; A.L.R.2d, Supp.Serv. (1960), 1998–1999, and subsequent Supplements. It was stated, with accuracy, in State v. Arnwine, 67 N.J.Super. 483, 495, 171 A.2d 124, 131, that 'there is not a single reported decision where an appellate court has permitted the introduction of the results of a polygraph or lie-detector test as evidence in the absence of a sanctioning agreement or stipulation between the parties.' Over the years, appellate courts have repeated the reason given in the 1923 landmark case of Frye v. United States, 54 App.D.C. 46, 293 F. 1013. In rejecting a predecessor of the 'lie-detector' for evidentiary purposes that court said: 'We think the systolic blood pressure deception test has not yet gained such standing and scientific rec-ognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made.' *Ibid.* 293 F. 1014. The controversy in scientific and legal circles swirling around the polygraph test continues without abatement. In addition to the existing plethora of writings on the subject, well documented articles continue to appear which raise grave doubts as to the scientific reliability of the polygraph tests. See Highleyman, The Deceptive Certainty of the 'Lie Detector,' 10 Hastings L.J. 47 (1958); Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection, 70 Yale L.J. 694 (1961). A recent and particularly devastating article on the untrustworthiness of the test is titled 'Don't Trust the Lie Detector,' Harv.Bus.Rev. (1962), 127, by Sternbach, Gustafson and Colier, two of whom are scientists. Numerous other authorities taking an unfavorable view of the 'lie-detector' are referred to in the cases cited above. The questions and doubts raised by these sources go, not only to the techniques employed in the administration of the tests, but to the very premises and assumptions upon which they rest. 'Emotional unresponsiveness,' '[a]bility to "beat" the machine,' '[p]hysiological abnormalities,' '[m]ental abnormalities,' '[n]ervousness or extreme emotional tension,' '[t]he misleading nature of available statistics,' and the 'conflict and disagreement among the examiners and authorities' are some of the variables which vitiate the alleged effectiveness of the tests and thus militate against their admissibility in evidence." (footnotes omitted).

In the instant case the State was not bound by any statement of the investigator. A grand jury could have indicted Grace without regards to the opinion of the polygraph operator that he was innocent. Grace could not have put that opinion before the trial jury over objection.

Under Butler v. State, Fla.App., 228 So. 2d 421, 36 A.L.R.3d 1274, an agreement by both parties *approved by the trial judge* was enforceable. Conversely without such solemnities the general rule of inadmissibility prevails.

The editor of the Anno. 41 A.L.R.3d 1369 says at 1373:

"No completely reliable physiological or psychological truth and deception test presently exists. The lie detector, for instance, is a scientific instrument which records certain physiological phenomena, such as changes in the pulse rate and blood pressure, on the theory that if a person answering questions is telling a lie, he will undergo ascertainable physiological changes not detectable if he is telling the truth; but on occasion, as is well known, it would appear that excitable individuals being subjected to a lie detector test undergo similar physiological changes, even when they are telling the truth. Similarly, the injection of a 'truth serum' and the use of hypnosis tend to deprive a subject of his self-control and willpower and inhibit his ability to construct barriers to telling the truth; but it is also known that they sometimes induce subjects to engage in fanciful or exaggerated versions of what the subject may incorrectly feel to be the truth. Therefore, it cannot be said that any of these tests unerringly and automatically require a subject to state only the exact truth." (footnotes omitted).

Considering the fallibility factor in polygraph examination and the failure to obtain a binding agreement approved by the trial judge, I think Grace was improperly induced into self-incrimination.

Under this view I would not reach the question of malice vel non.

For the above reason I vote to reverse the conviction.

ALMON, Judge (dissenting).

The majority opinion correctly states the rule that malice may be presumed from the use of a deadly weapon unless the evidence which proves the killing rebuts the presumption. I believe however it is for the jury to decide whether this presumption has been rebutted. Eiland v. State, 52 Ala. 322; Compton v. State, 110 Ala. 24, 20 So. 119.

The trial judge properly charged the jury on the effect of the above rule and the jury obviously saw fit to presume malice from the use of the deadly weapon. This court has concluded as a matter of law that the facts which proved the killing conclusively rebutted the presumption of malice.

The only theories which could possibly be advanced from the evidence which tended to rebut this presumption would be either that the defendant was too intoxicated to entertain malice or that the shooting was an accident.

It was not shown appellant was so intoxicated that he could not entertain malice when the killing occurred. The evidence only shows that appellant was drinking with the deceased and another man prior to the shooting which occurred about 8:30 P.M. and that appellant was found passed out about 10:00 P.M. What happened during the approximately ninety minutes between the shooting and appellant's being found passed out is not shown.

The State's witness testified it was unlikely the weapon used to kill the deceased could have been fired accidentally as appellant contended in his statement. There was evidence from photographs of the body and testimony of the state toxicologist that the deceased was shot twice—once in the chest and once in the left hip or buttock area. There was also testimony that four or five spent cartridge shells were found at the scene. It is unlikely that one could be accidentally shot in such a manner.

Therefore, neither theory conclusively rebutts the presumption of malice.

In my judgment a jury question was presented and I would not disturb the lower court's ruling.

TYSON, Judge (dissenting).

In my judgment the facts relied on by the majority are insufficient for this court to hold as a matter of law that the presumption of malice arising from the use of a deadly weapon has been conclusively rebutted. Therefore, most respectfully, I join in the dissent of my brother judge, Almon, J.

ON REHEARING

MERRILL, Supreme Court Justice.

Pursuant to Section 13 of Act No. 987, 1969 Acts of Alabama, p. 1744, (see 1958 Recompiled Code, Title 13, Section 111(13), Pocket Part), Judge Aubrey M. Cates, Jr., Presiding Judge of the Court of Criminal Appeals, certified to the Chief Justice of the Supreme Court that in the case of John Clifford Grace v. State, 7 Div. 120, pending in that court, there is a vacancy on the court and the other four members are evenly divided as to a decision of the case on application for rehearing.

Pursuant to such certification, the Chief Justice, on July 11, 1972, appointed the writer to sit with the divided members of the Court of Criminal Appeals to consider and decide the case.

As I understand it, the single question on which the four judges of the Court of Criminal Appeals are evenly divided is whether the original opinion in this case is correct in holding that, as a matter of law, no malice was shown by the evidence "except that which is inferable from the use of the deadly weapon and the law says that this presumption does not obtain where 'the circumstances of the killing disprove malice.'"

In Kissic v. State, 40 Ala.App. 178, 110 So.2d 327, the court stated:

"Under the tendencies of the State's evidence the deceased met his death as a result of the use of a deadly weapon, a knife, wielded by Harper. The appellant was present aiding and abetting. Under such circumstances, the jury could infer malice unless the evidence proving the killing rebutted the presumption. Booth v. State, 247 Ala. 600, 25 So.2d 427; Grays v. State, 28 Ala.App. 394, 185 So. 191; Moore v. State, 31 Ala.App. 483, 18 So.2d 803.

"The State's evidence therefore established murder in the second degree.

"As stated in Compton v. State, 110 Ala. 24, 20 So. 119, 122:

"'When the facts which prove the killing do not rebut the presumption, which the law raises, the burden is on the defendant by other evidence to rebut it, and failing to meet this burden, the presumption of the law is against him.'"

It seems to me that one fact should be added to remove any conjecture that Gossett shot the deceased. In his second statement given to the officers, the defendant stated just above his signature that: "Coleman Gossett didn't fire my rifel [sic] at anytime."

I agree with Judges Almon and Tyson that the facts stated in the opinions in this case on original deliverance presented a jury question as to malice and that the trial court would have erred had it given the requested general affirmative charge as to murder in the second degree.

It follows that the application for rehearing is granted and the judgment of the circuit court is due to be affirmed.

Affirmed.

ALMON and TYSON, JJ., concur.

CATES, P. J., and HARRIS, J., dissent.