OPINION
{¶ 1} Defendant-appellant Shawn L. Richmond appeals from his conviction and sentence for Sexual Battery and Unlawful Sexual Conduct with a Minor, following a jury trial. Richmond first contends that the prosecutor's improper comments throughout the trial and during closing arguments denied him a fair trial. Although some of the comments made by the prosecutor were improper, we conclude that Richmond was not prejudiced. Based on the evidence in the record, it is clear, beyond a reasonable doubt, that the jury would have found Richmond guilty even without the prosecutor's improper remarks.
 {¶ 2} Richmond next contends that his counsel was ineffective in failing to object to the prosecutor's improper remarks. Because we have concluded that some of the prosecutor's comments were not improper and that the outcome of the trial would not have been different without the improper comments, we conclude that Richmond's trial counsel was not ineffective for having failed to object to the remarks.
 {¶ 3} Richmond contends that the trial court erred in merely instructing the jury that closing argument is not evidence and that the jury must rely on the evidence presented in the case to determine the facts, when he objected to the prosecutor's reference to a statement that was not in evidence. We conclude that the trial court did not commit prejudicial error. Defense counsel failed to object to the prosecutor's further discussion of the statement, and Richmond was not prejudiced by the prosecutor's improper comments regarding the statement.
 {¶ 4} Richmond contends that the trial court erred in basing his sentence on his cousins' involvement in the incident. We conclude that the trial court did not err in sentencing Richmond; the record shows that the trial court emphasized that Richmond's prior history, including two prison terms, as well as the age of the victim and the impact of the crime upon the victim, formed the basis of the sentence.
 {¶ 5} Richmond contends that the trial court failed to instruct the jury in accordance with the guidelines set forth inState v. Valdez (1962), 91 Ariz. 274, 283-284, 371 P.2d 894,900, and adopted by the Supreme Court of Ohio in State v. Souel
(1978), 53 Ohio St.2d 123, 132, 7 O.O.3d 207, 372 N.E.2d 1318, regarding polygraph tests. After reviewing the trial court's jury instructions, we conclude that the trial court properly instructed the jury regarding the polygraph test in compliance with the guidelines set forth in Valdez, supra, and adopted by the Supreme Court of Ohio in Souel, supra.
 {¶ 6} Richmond contends that even if the isolated errors during trial did not rise to the level of prejudicial error, the cumulative effect of the errors deprived him of a fair trial.
 {¶ 7} Although Richmond's trial was not without error, we conclude, based upon our review of the entire record, that the errors committed, even when viewed cumulatively, were not sufficiently prejudicial to merit reversal.
 {¶ 8} Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 9} On the evening of June 11, 2004, fifteen-year-old L.S. arrived with a friend to a party at Pam Day's house in Bowersville, Ohio. Thirty-one-year-old Shawn Richmond was also at the party with his cousins, Brandon Sams and Eric Grooms, L.S.'s ex-boyfriend. Alcohol was being consumed at the party, and L.S. became intoxicated throughout the evening. From what she could recall, L.S. alleged that she was in Day's side yard when Richmond pulled her pants and underwear down and performed oral sex on her vaginal area while Sams stood above her head holding her arms down. She claimed that Grooms watched from the side and that she asked him for help. L.S. claimed that when Richmond got up and left, Sams pulled her up and Grooms pulled her pants up and fastened them.
 {¶ 10} Richmond was subsequently indicted on one count of Sexual Battery and one count of Unlawful Sexual Conduct with a Minor, with the specification that Richmond was ten years older or more than the victim. Richmond volunteered to take a polygraph examination with the purpose of determining whether he committed the crimes alleged in the indictment, and entered into a stipulation appropriate to this purpose. This case then proceeded to a jury trial. Richmond was found guilty of Sexual Battery and Unlawful Sexual Conduct with a Minor. The jury also found that Richmond was ten years older or more than the victim. Richmond was sentenced to four years of imprisonment for Sexual Battery and four years of imprisonment for Unlawful Sexual Conduct with a Minor, to be served concurrently, and was ordered to register as a Sexually Oriented Offender. From his conviction and sentence, Richmond appeals.
 II {¶ 11} Richmond's First Assignment of Error is as follows:
 {¶ 12} "APPELLANT WAS DENIED DUE PROCESS AND A FAIR TRIAL BECAUSE OF PROSECUTORIAL MISCONDUCT."
 {¶ 13} Richmond contends that the prosecutor's improper comments denied him a fair trial. Richmond first contends that during closing arguments, the prosecutor improperly referred to Brandon Sams's statement which was unsupported by the evidence. Richmond contends that the prosecutor's improper statements were prejudicial because the prosecutor used Sams's statement to corroborate L.S.'s testimony, thereby bolstering her credibility which was at issue.
 {¶ 14} When determining whether a prosecutor's remarks constitute prosecutorial misconduct, we analyze: "(1) whether the remarks were improper and (2), if so, whether the remarks prejudicially affected the accused's substantial rights. The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.' We will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." State v. Tenace,109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, at ¶ 45, internal citations omitted.
 {¶ 15} Prosecutors and defense counsel have a wide degree of latitude during closing arguments to address what the evidence has shown and what reasonable inferences may be drawn from that evidence. State v. Lott (1990), 51 Ohio St.3d 160, 165,555 N.E.2d 293. However, prosecutors must refrain from making misleading insinuations and assertions as well as expressing personal beliefs or opinions regarding the defendant's guilt. Id. at 166. Prosecutors must also refrain from alluding to matters unsupported by admissible evidence. Id. "It is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury." State v.Smith (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883, citation omitted.
 {¶ 16} During closing arguments, the prosecutor stated the following:
 {¶ 17} "But one of the things she [L.S.] told the counselor is that she was held down by Brandon, she remembered Brandon's conduct, and he was leaning over her head. She was right about that. She may not remember everything, but she was right about him being over her head and holding her down and she told the counselor that she remembered the Defendant performing oral sex on her.
 {¶ 18} "That part, and what's important about that, we'll get to that later, is that [L.S.] gave that statement originally to a counselor some time some time [sic] in September. This is before anyone had talked to Brandon. Detective Walton told you he took a statement from Brandon that was consistent with what [L.S.] told him with respect to that conduct. [L.S.] didn't know — Brandon hadn't seen [L.S.'s] statement.
 {¶ 19} "MR. HUELSMAN: Your Honor, objection. There's nothing about Brandon Sams' testimony here.
 {¶ 20} "MR. HUNTER: Detective Walton testified that he took a statement from him and that it was consistent, Your Honor.
 {¶ 21} "THE COURT: I'll just indicate to the Jury, once again, what is said in closing argument is not evidence. You will rely upon the evidence that was presented in this case to determine what the facts are. Thank you. Please proceed.
 {¶ 22} "MR. HUNTER: Detective Walton testified that he took a statement from Brandon, and with respect to what Brandon had to tell him, one of the things that Brandon did tell him is consistent with what [L.S.] had said regarding exactly that.
 {¶ 23} "Further, he's going to say it was Eric Grooms, and Eric Grooms did testify. Eric Grooms, even in his original statement, [L.S.] remembered — under the next bullet, [L.S.] remembered asking Eric for help and him not helping her."
 {¶ 24} The State concedes that it would be improper for the prosecutor to comment on Sams's statement, which was not in evidence, but argues that it was an unintentional misstatement of the evidence, not intended to mislead the jury. The State contends that a closer reading of the transcript reveals that the prosecutor confused Sams with Grooms. We disagree.
 {¶ 25} This argument may make sense regarding the prosecutor's statements prior to defense counsel's objection. However, when defense counsel objected stating "[t]here's nothing about Brandon Sams' testimony here," it seems that the prosecutor would have argued in response that in fact, Grooms had testified, rather than stating that "Detective Walton testified that he took a statement from him and that it was consistent." In addition, when the prosecutor stated, "Further, he's going to say it was Eric Grooms, and Eric Grooms did testify," he seems to be shifting from one witness's statements to another's, rather than talking about the same witness, merely confusing Sams with Grooms. The prosecutor also did not seem to be confusing Sams with Grooms when he stated that "[L.S.'s] statements were subsequently corroborated by Eric Grooms, Brandon Sams and Cindy Erwin of BCI I." The prosecutor distinguishes Sams from Grooms by individually identifying them as corroborating L.S.'s statements.
 {¶ 26} A review of the record shows that Sams did not testify and Detective Walton did not testify regarding Sams's statement to him. Because the record is devoid of any evidence regarding Sams's statements to Detective Walton, we conclude that the prosecutor's remarks were improper. However, it appears clear, beyond a reasonable doubt, that the jury would have found Richmond guilty even without the improper remarks.
 {¶ 27} L.S. testified that she was in Pam Day's side yard when Richmond pulled her pants and underwear down and performed oral sex on her vaginal area, while Sams stood above her head holding her arms down. She testified that Grooms, her ex-boyfriend, watched from the side and that she asked him for help. L.S. testified that when Richmond got up and left, Sams pulled her up and Grooms pulled her pants up and fastened them. L.S. testified that the next day, she approached Grooms to ask him why he did not help her the night before. She testified that Grooms replied that he was scared because it would be two against one, Sams and Richmond against him. L.S. testified that she had not spoken to Grooms since that day. L.S. testified that although she was intoxicated that night and does not remember every detail of the evening, she is very certain that Richmond performed oral sex on her. She testified that she has never changed her story.
 {¶ 28} Grooms testified that he witnessed Richmond having oral sex with L.S. and Sams restricting her arms. He testified that he also witnessed Sams putting his penis in L.S.'s mouth. Grooms testified that he didn't say anything or do anything to stop them because it was his family and he was afraid of them. Grooms testified that when Richmond stopped performing oral sex on L.S., Sams helped her stand up and Grooms pulled her underwear and pants up. Grooms testified that L.S. was trying to get help from him. He testified that L.S. asked him the next day why he didn't help her and that he told her it was because he was scared and it was two against one. Grooms testified that he spoke to L.S. only that one time after the incident. On cross-examination, Grooms admitted that he was also involved. He testified that he rubbed L.S.'s vagina when Richmond got up to use the bathroom, but stopped when Richmond returned and continued to perform oral sex on L.S.
 {¶ 29} Detective Robert Walton of the Greene County Sheriff's Office testified that L.S.'s testimony was consistent with the statement she gave him in November, 2004. He testified that her story never changed. Detective Walton also testified that Grooms's statement corroborated L.S.'s statement, although he did not initially admit his own involvement or Sams's involvement in the incident.
 {¶ 30} Richmond also voluntarily agreed to take a polygraph examination, for the purpose of determining whether he committed the crimes alleged in the indictment. Cynthia Erwin of the Bureau of Criminal Identification and Investigation testified that she conducted the polygraph examination and asked Richmond the following relevant questions: "Did you ever put your mouth on [L.S.'s] bare vagina? Did you ever perform oral sex on [L.S.]? Did you ever commit a sex act upon [L.S.]? Did you ever put your mouth on [L.S.'s] bare private area?" Erwin testified that she performed the test three times asking Richmond the same relevant questions. She testified that Richmond's response to each question each time was "no." Erwin testified that she determined that Richmond was deceptive in his responses on each test. Erwin testified that although polygraph examinations are not an exact science, she renders an inconclusive result if she is not one hundred percent sure that the person is telling the truth or lying.
 {¶ 31} Grooms's testimony corroborates L.S.'s testimony as to Richmond performing oral sex on L.S. Although Grooms may have lost credibility in the eyes of the jury with his delay in admitting his involvement, he nevertheless ultimately testified against his own penal interest, making him more credible. Grooms admitted his involvement, despite the fact that L.S. merely testified that Grooms did not help her, not that he participated. Detective Walton's testimony shows the consistency of L.S.'s statement as well as Grooms' corroboration of L.S.'s testimony. In addition to two witnesses testifying that Richmond performed oral sex on L.S., Richmond's polygraph was before the jury showing that he was deceptive when asked whether he committed the act.
 {¶ 32} Based on the foregoing evidence, it appears clear, beyond a reasonable doubt, that the jury would have found Richmond guilty even without the improper remarks. The trial judge did instruct the jury, both generally, and following defense counsel's objection to the reference to Sams's statement, that closing argument is not evidence. We conclude that the prosecutor's improper remarks during closing argument did not prejudicially affect Richmond's substantial rights.
 {¶ 33} Richmond next contends that during closing arguments, the prosecutor improperly referred to a statement taken from, and interviews conducted with, Pam Day by Detective Walton, which were not in evidence. Richmond contends that the prosecutor's improper remarks were prejudicial because they damaged Day's credibility with the jury.
 {¶ 34} Pam Day testified that she saw L.S. the next day riding on a four-wheeler with Richmond. During closing arguments, the prosecutor stated as follows:
 {¶ 35} "And this four wheeler thing, all the times Detective Walton has interviewed Miss Sams, I mean, Miss Day in our office and also he took a statement from her, we interviewed her just before coming in here, asked her do you have anything — did you ever see the victim with the Defendant? We asked her that, and in her statement, never. Suddenly, a year later she says she talked to Counsel on the 15th of June, a year later. Oh, yeah, I did see them. I recall now a year earlier them being on the four wheeler. After being interviewed three different times and never saying that, never, she suddenly remembered saying that."
 {¶ 36} Because defense counsel did not object to the alleged improper statements made by the prosecutor, any claim of error regarding the statements is considered waived unless, but for the error, the outcome of the trial clearly would have been different. State v. Ballew, 76 Ohio St.3d 244, 251,1996-Ohio-81, 667 N.E.2d 369. Reversing a conviction for plain error should be done only in exceptional circumstances and to prevent a manifest miscarriage of justice. State v. Jenks
(1991), 61 Ohio St.3d 259, 282, 574 N.E.2d 492.
 {¶ 37} Although Day's statement to Detective Walton is not in evidence, Day did testify on cross-examination that she recalled coming into the prosecutor's office and talking with the prosecutor, Miss Thomas, and Detective Walton. The prosecutor then asked her the following question regarding the interview:
 {¶ 38} "Q. All right. Do you remember when I asked you in my office with Detective Walton there if you had seen the victim and the Defendant together at all after this incident, and I queried you about that and you told me no. You thought for a minute, and you said, `No.' You never said anything about this incident and the supposed riding on the back of this four-wheeler vehicle. Do you remember me asking you that?
 {¶ 39} "Q. I don't remember. I'm sorry."
 {¶ 40} Although it was not improper for the prosecutor to ask this question on cross-examination, Day responded that she did not remember telling the prosecutor and Detective Walton that she did not see L.S. and Richmond together after the incident. There is no evidence in the record that Day stated during an interview or in a statement to Detective Walton that she never saw L.S. with Richmond on a four-wheeler after the incident. Therefore, it was improper for the prosecutor to state in closing arguments that Day stated in her statement and during her interview that she never saw L.S. with Richmond together after the incident. The prosecutor was misleading the jury by alluding to matters unsupported by admissible evidence.
 {¶ 41} We do not conclude that the outcome of the trial would clearly have been different had the prosecutor not improperly said in closing arguments that Day said in her statement and during her interview that she never saw L.S. with Richmond after the incident. Based on the evidence, it appears clear, beyond a reasonable doubt, that the jury would have found Richmond guilty even without the improper remarks. We conclude that the prosecutor's improper remarks during closing arguments did not prejudicially affect Richmond's substantial rights.
 {¶ 42} Richmond next contends that during the trial, the prosecutor improperly referred to testimony by other witnesses that L.S. was riding on a four-wheeler with Richmond the day after the incident during the early morning hours, contrary to Richmond's testimony that it was in the early afternoon. Richmond contends that the prosecutor's mischaracterization of this evidence was prejudicial to him because it confused the jury, causing them to disregard corroborative testimony that L.S. was riding around on a four-wheeler with him the day after he allegedly performed oral sex on her without her consent.
 {¶ 43} On cross-examination, the prosecutor questioned Richmond as follows:
 {¶ 44} "Q. Okay. Now, you indicated earlier on direct, and maybe it's just a slip, but you indicated that the next day or whatever, we can read it back, you first indicated that the next day you slept in late and didn't get up until the afternoon. Do you remember that?
 {¶ 45} "A. It was like 12:30, 1:00, something like that.
 {¶ 46} "Q. Okay. Well, did you hear testimony earlier, I think it was Pam or whatever — well, both of them curiously remembered after a year of you riding the victim on this four wheeler? Do you remember them saying that was early in the morning?
 {¶ 47} "A. Well, if you check the weather, it was raining early that morning and the sun didn't come out until that afternoon.
 {¶ 48} "Q. What I'm asking you is this: Just focus on what I'm saying. You testified at first earlier, and we can go back and read it, that you slept in late. You said late in the afternoon. That's what you said to this Jury.
 {¶ 49} "A. 12:30, 1:00, that's late for me.
 {¶ 50} "Q. Okay.
 {¶ 51} "A. Somebody who usually gets up at 6:00, 7:00 in the morning.
 {¶ 52} "Q. Okay. But, yet, it was testified to earlier that it was — it was early morning hours actually, what was said, when they saw you riding this four wheeler supposedly with the victim riding on the back of it on that day. Do you remember that?
 {¶ 53} "A. Yeah, I remember.
 {¶ 54} "Q. Do you remember that testimony? So that testimony was wrong, too, that person that testified to that?
 {¶ 55} "A. They're mistaken about the time is all I can say.
 {¶ 56} "Q. So when Pam and the other friend, I forget her name now, but your former friend there, when they testified in the early morning hours — in the early morning they had seen you with her riding on this moped, that they're mistaken as to the time? It was more like 1:00 in the afternoon?
 {¶ 57} "A. I ain't even sure. I mean, I can't tell you exactly what time. I mean —
 {¶ 58} "Q. Okay."
 {¶ 59} When asked whether she saw L.S. riding on the four-wheeler with Richmond during the morning, Day testified that she did not remember if it was in the morning, but she remembered that it was sunny. Michele Minnix was the only other witness, besides Richmond, who testified to having seen L.S. with Richmond on the four-wheeler the day after the alleged incident. Minnix never testified concerning the time of day that she saw L.S. with Richmond on the four-wheeler.
 {¶ 60} Richmond's testimony that he gave L.S. a ride on his four-wheeler in the early afternoon is not in conflict with the testimony of Day and Minnix, since neither witness testified that they observed L.S. riding with Richmond in the early morning. Day's testimony corroborates Richmond's testimony to the extent that she said she saw them when it was sunny, and Richmond testified that it rained in the morning that day and was sunny in the afternoon.
 {¶ 61} We conclude that the prosecutor improperly misrepresented the evidence when he stated that the other witnesses testified that they observed L.S. with Richmond on the four-wheeler during the early morning hours. However, Richmond's failure to object waived all but plain error, and we do not conclude that the outcome of the trial would clearly have been different had the prosecutor not improperly referred to testimony by other witnesses that L.S. was riding on a four-wheeler with Richmond during the early morning hours, contrary to the evidence in this case. Based on the evidence, it appears clear, beyond a reasonable doubt, that the jury would have found Richmond guilty even without the improper remarks. We conclude that the prosecutor's improper remarks did not prejudicially affect Richmond's substantial rights.
 {¶ 62} Richmond next contends that the prosecutor improperly attempted to impeach Minnix regarding her relationship with Richmond, which was prejudicial to him because it suggested a motivation for Minnix to lie.
 {¶ 63} In cross-examining Minnix, the prosecutor asked the following questions relating to her relationship with Richmond:
 {¶ 64} "Q. Ma'am, I don't want to quibble, but this is an issue of credibility. Do you remember a few moments ago, I just interviewed you for the first time, in fact. I wasn't able to get a hold of you, but I interviewed you with Detective Walton present and with Miss Thomas present.
 {¶ 65} "A. Mmm-hmm.
 {¶ 66} "Q. Well, let me get my question out. Do you remember me interviewing you just a few moments ago in the outer office across the hall in the Court's chambers?
 {¶ 67} "A. Yes, sir.
 {¶ 68} "Q. And do you remember me asking you, first of all, whether or not you had an affair with the Defendant is irrelevant except it goes to the issue of your credibility.
 {¶ 69} "A. Exactly.
 {¶ 70} "Q. Do you remember me asking you about that?
 {¶ 71} "A. Yes, sir, I do.
 {¶ 72} "Q. Did you lie to me then or did you lie just now to this Jury when you said you had an affair six years ago? Because do you remember telling us that it was four years ago?
 {¶ 73} "A. Did I say six?
 {¶ 74} "Q. Just now you said six.
 {¶ 75} "A. It was four.
 {¶ 76} "Q. Okay. It was four years ago?
 {¶ 77} "A. Exactly.
 {¶ 78} "Q. And that was an affair that you had with this Defendant that last awhile, didn't it?
 {¶ 79} "A. Just like six, seven months.
 {¶ 80} "Q. So it wasn't just a one-time thing, was it?
 {¶ 81} "A. Huh-uh.
 {¶ 82} "Q. And, in fact, you're friends with the Defendant. Do you remember me asking you that, are you friends with the Defendant?
 {¶ 83} "A. Mmm-hmm.
 {¶ 84} "Q. And that's okay, I mean, but the fact of the matter is, you're here testifying for someone that you've known since high school —
 {¶ 85} "A. Exactly.
 {¶ 86} "Q. — and you're very good friends with. You've been intimate with him many times, correct?
 {¶ 87} "A. Just on that one occasion over the six months."
 {¶ 88} During closing arguments, the prosecutor argued that Minnix testified that she had an affair with Richmond and that "[a]t first she said one time, and then she admitted she lied and said six to eight months." The prosecutor then stated "[i]n reality the evidence in this Courtroom looked like it's still going on." During the trial, the prosecutor also referenced an on-going relationship between Minnix and Richmond, even referring to Richmond as her current boyfriend.
 {¶ 89} Minnix testified that she had a one-time fling with Richmond a few years ago. "Fling" is defined as "[a] brief period of indulging one's impulses." Webster's II New College Dictionary (1995) 428. Minnix's later clarification that her affair with Richmond lasted six to seven months, which could reasonably be thought a brief period of time in the context of love affairs, is not inconsistent with calling it a one-time fling. In addition, a review of Minnix's testimony shows that she never testified that the affair was six years ago and never admitted that she had lied. There also is no evidence in the record that Minnix was currently in a relationship with Richmond. To the contrary, when the prosecutor asked Minnix if she was still having an affair with Richmond, she testified that she was not.
 {¶ 90} We conclude that the prosecutor's comments regarding Minnix's relationship with Richmond were improper. However, Richmond's failure to object waived all but plain error, and we do not conclude that the outcome of the trial would clearly have been otherwise had the prosecutor not improperly referred to Minnix's relationship with Richmond. Based on the evidence, it appears clear, beyond a reasonable doubt, that the jury would have found Richmond guilty even without the improper remarks. We conclude that the prosecutor's improper remarks did not rise to the level of plain error.
 {¶ 91} Richmond also contends that the prosecutor's comments that Minnix badgered L.S. about the incident with Richmond were improper because there was no evidence to support the assertion.
 {¶ 92} During closing arguments, the prosecutor commented on several occasions that Minnix badgered L.S. into talking about the incident with Richmond. The prosecutor also commented that "[L.S.] stated that Michelle Minnix, who was having an affair with the Defendant, eventually tried to pry into her business and asked her about what had happened."
 {¶ 93} The record shows that L.S. never testified that Minnix tried to pry into her business about the incident. In addition, Minnix testified that she never questioned L.S. and that L.S. told her about the incident. There is no evidence in the record that Minnix badgered L.S. into talking about the incident.
 {¶ 94} We conclude that the prosecutor improperly commented that Minnix badgered L.S. into talking about the incident and that L.S. stated that Minnix tried to pry into her business. However, Richmond's failure to object waived all but plain error, and we do not conclude that the outcome of the trial would clearly have been otherwise had the prosecutor not improperly characterized this evidence. Based on the evidence in the record, it appears clear, beyond a reasonable doubt, that the jury would have found Richmond guilty even without the improper remarks. We conclude that the prosecutor's improper remarks during closing arguments do not rise to the level of plain error.
 {¶ 95} Richmond next contends that the prosecutor mischaracterized Minnix's testimony when he asked Minnix the following:
 {¶ 96} "Q. You testified that on that next day, whatever day that was, you think you saw the victim on the back of the four wheeler.
 {¶ 97} "A. I did see her.
 {¶ 98} "Q. Please let me finish my question, ma'am, okay? You testified that you think you saw the victim on the back of a four wheeler driven by the defendant, correct?
 {¶ 99} "A. Yes."
 {¶ 100} Richmond contends that the prosecutor made it seem that Minnix was uncertain as to whether she saw L.S. riding with Richmond on the four wheeler the day after the incident, when in fact, she was certain as to what she saw. We disagree.
 {¶ 101} The prosecutor followed up these two questions by asking Minnix, "You're sure you saw that?" Minnix replied, "Yes, I'm positive." We conclude that the prosecutor's comments in the prior two questions that "you think you saw" is not improper when he immediately followed up by asking Minnix if she was sure of what she saw and she said yes.
 {¶ 102} Richmond contends that the prosecutor improperly stated during closing arguments that it was "apparent and obvious" that L.S. and Grooms had not spoken about the incident.
 {¶ 103} During closing arguments, the prosecutor stated that "it's clear that Eric and [L.S.] did not talk about this. That's apparent and obvious." However, the prosecutor had previously argued the following:
 {¶ 104} "Eric and [L.S.], after that day, that conversation they had the next day when she asked him why didn't you help me, they hadn't talked to any each [sic]. They certainly hadn't seen each other's statements, and I'm sure the school counselor did not confer and show [L.S.'s] statement to Eric."
 {¶ 105} The prosecutor attempted to establish that L.S. and Grooms had not spoken to each other before giving their statements to Detective Walton, not that they had never spoken about the incident. L.S. and Grooms both testified that they spoke to each other the day after the incident but that they did not speak again after that point. Therefore, there was evidence that L.S. and Grooms did not talk to each other following the day after the incident. Based on this evidence, we conclude that the prosecutor's statements were not improper.
 {¶ 106} Richmond also contends that the prosecutor's statement that the counselor did not show L.S.'s statement to Grooms was improper.
 {¶ 107} The prosecutor did not state that the counselor did not show L.S.'s statement to Grooms. He said that "I'm sure the school counselor did not confer and show [L.S.'s] statement to Eric." (Emphasis added). Although it is his opinion, it seems reasonable to infer that a school counselor would not show Grooms L.S.'s statement. We conclude that the prosecutor's statement is not improper.
 {¶ 108} Richmond next contends that the prosecutor's suggestion that the polygraph was ninety percent accurate was improper and not based on evidence.
 {¶ 109} During closing arguments, the prosecutor stated the following:
 {¶ 110} "You know, it's one thing to talk about Miss Erwin because she's an expert, a polygraph expert. But it's not a hundred percent. You know, I don't know if you want to put 90 percent on it or whatever. It's not a hundred percent. It's not something — ultimately it's your decision. And, frankly, nothing is a hundred percent. We wouldn't have Juries if that's the case.
 {¶ 111} "It's totally and completely your decision and your purview as to whom to believe and what to believe. * * *"
 {¶ 112} The prosecutor does not suggest that the evidence shows that the polygraph test is ninety percent accurate. Although the prosecutor does suggest that the jury may want to put a ninety percent accuracy rating on the polygraph test, his focus is on informing the jury that the polygraph test is not one hundred percent accurate and that it is ultimately their decision whom to believe. Therefore, we conclude that the prosecutor's statement was not improper.
 {¶ 113} Richmond next contends that the prosecutor impugned defense counsel for objecting to the prosecutor's reference to Sams's statement. Richmond points to the following comment made by the prosecutor:
 {¶ 114} "And what's also important, you know, counsel said and repeated again, and I don't believe in objecting because I don't want to be rude during closing, but there is — it's clear that Eric and [L.S.] did not talk about this."
 {¶ 115} The prosecutor makes no reference to defense counsel's objection to Sams's statement. Although it the prosecutor's statement could be taken to imply that defense counsel was rude for objecting, the prosecutor did not directly say that defense counsel was rude, only that he didn't want to be rude by objecting. This court has previously noted that "[c]losing argument is a phase of the trial in which opposing counsel are trained to treat one another with particular deference. It is the tradition in this legal community to avoid interrupting opposing counsel's closing argument if at all possible[.]" State v. Luoma, Montgomery App. No. 10719,1990 WL 197944, at *6. Therefore, we conclude that it was not improper for the prosecutor to have said that he does not believe in objecting because he does not want to be rude.
 {¶ 116} Richmond next contends that the prosecutor improperly vouched for L.S. and stated his own opinion apart from the evidence.
 {¶ 117} Minnix testified that L.S. told her that "she was so fucked up that she didn't remember what happened." During closing arguments, the prosecutor stated the following:
 {¶ 118} "I'm not sure she [L.S.] used the F word, and I want to make it clear, that's not common in this Courthouse. I apologize for that. We don't do that in here. It's not business as usual here, and I've never heard [L.S.] use that, and I don't believe that that was used, and I didn't hear her use it on the witness stand. But I think she did say to her hey, I don't remember anything. I don't want to talk about it. I think that's what was said. In fact, [L.S.] told us that's what was said."
 {¶ 119} The prosecutor's statements vouch for L.S.'s good manners rather than for her integrity, which does not necessarily make her more credible as a witness. However, there is no evidence in the record that L.S. testified that she told Minnix that she didn't remember anything and that she didn't want to talk about it. The prosecutor's misstatement of the evidence, however, corroborates the testimony of Richmond's witness, Minnix, that L.S. told her that she didn't remember anything. Therefore, we conclude that the prosecutor's statements were not prejudicial to Richmond.
 {¶ 120} Richmond also contends that the prosecutor vouched for Grooms, when he stated during closing argument that Grooms "didn't fully tell the truth, but he never lied, even in his original statement."
 {¶ 121} The prosecutor went on to clarify what he meant by stating that Grooms "never lied." The prosecutor stated that Groom's "statements were corroborated, or I should say a corroboration of what the victim had told, months earlier, a counselor in private." The prosecutor was not vouching for Groom's integrity, but inferring that the evidence showed that Grooms never lied, since his original statement was corroborated by L.S.'s statement. We conclude that the prosecutor's statements were not improper.
 {¶ 122} Richmond next contends that the prosecutor improperly bolstered Groom's credibility through inadmissible character evidence. In support of his contention, Richmond cites Evid.R. 608 which states as follows:
 {¶ 123} "The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."
 {¶ 124} On direct examination, the prosecutor asked Grooms the following questions:
 {¶ 125} "Q. You have never been in trouble before, have you?
 {¶ 126} "A. No.
 {¶ 127} "Q. You have no criminal record or anything?
 {¶ 128} "A. No.
 {¶ 129} "Q. So this is new for you?
 {¶ 130} "A. Yes.
• * *
 {¶ 131} "Q. All right. Tell the ladies and gentlemen of the Jury, why didn't you step in and stop that and say hey, stop? Here you are, you have never been in trouble before, you've never had any kind of anything. Why didn't you step in and stop that, Eric? You're a good kid.
 {¶ 132} "A. I was scared. It was my family and I didn't — I was afraid of them pretty much. It was two against one."
 {¶ 133} During closing argument, the prosecutor stated as follows:
 {¶ 134} "Eric is someone, I think you can see form his demeanor, he's never been in trouble before. He's never been to prison before. He's never had any kind of problems, anything, school or anything. You know, he's not used to this kind of stuff. * * * You assess his credibility."
 {¶ 135} The prosecutor did not offer evidence in the form of opinion or reputation to support Grooms's credibility, but merely asked Grooms himself if he had been in trouble before or if he had a criminal record to which he responded no. Based on Grooms's response, the prosecutor questioned why Grooms, a "good kid," would not have helped L.S. We do not find this line of questioning to have been improper. It went to Grooms's role in the incident, and hence to his bias and credibility as a witness to the incident.
 {¶ 136} Richmond also contends that the prosecutor improperly stated during closing argument that Grooms had never been in trouble at school. Although Grooms did not specifically testify that he had never been in trouble at school, he did testify that in general, he had never been in trouble before, which could include never being in trouble at school. We conclude that the prosecutor's statement was not improper.
 {¶ 137} Richmond next contends that the prosecutor improperly commented on Richmond's failure to attend the first polygraph appointment. Richmond contends that "[n]either a professed willingness nor a refusal to submit to polygraph testing is admissible evidence."
 {¶ 138} The prosecutor asked Cynthia Erwin the following questions:
 {¶ 139} "Q. All right. Now, it's my understanding that there had to be two appointments made for the Defendant, is that correct?
 {¶ 140} "A. Yes, that's correct.
 {¶ 141} "Q. Explain to the ladies and gentlemen of the Jury what happened with respect to the initial appointment that was made for the Defendant.
 {¶ 142} "MR. HUELSMAN: Your Honor, I'm going to object. It's irrelevant. He's completed the test. It doesn't matter.
 {¶ 143} "MR. HUNTER: It [sic] highly relevant. Your Honor, it goes to the —
 {¶ 144} * * *
 {¶ 145} "THE COURT: Objection sustained.
 {¶ 146} "Q. All right. Eventually the defendant shows up and does the polygraph, is that correct?
 {¶ 147} "A. That's correct."
 {¶ 148} There is no evidence that the prosecutor attempted to establish that Richmond refused to submit or did not willingly submit to a polygraph test. The prosecutor established, without objection, that there were two appointments made for Richmond's polygraph test. The trial court then sustained Richmond's objection to the prosecutor's ensuing question, and the prosecutor was not permitted to have Erwin testify what became of the initial appointment. Although the prosecutor then questioned whether Richmond eventually showed up for his polygraph test, he did not further question Erwin regarding what happened with the initial appointment. In addition, the trial court instructed the jury that they were not to speculate as to why the trial court sustained any objections and were not to speculate what the answer to such questions might have been. We conclude that it was not improper for the prosecutor to ask Erwin whether Richmond eventually showed up for his polygraph test.
 {¶ 149} In Richmond's final contention, he argues that the prosecutor improperly led L.S. into testifying that she reported the incident with Richmond because she was still deeply upset about it months later. Richmond contends that the prosecutor improperly suggested several times that L.S. told her counselor about the incident because the counselor asked her why she was crying so much. Richmond argues that there was no testimony that L.S. had been crying when she told the counselor about the incident.
 {¶ 150} On direct examination, the prosecutor asked L.S.:
 {¶ 151} "Q. All right. And the counselor asked what happened because you were crying so much, is that correct?
 {¶ 152} "A. Yes."
 {¶ 153} On redirect examination, the prosecutor asked L.S. again:
 {¶ 154} "Q. Correct me if I'm wrong, I think on direct you stated that the reason you even came out was because a counselor knew you were crying and you told the counselor why you were crying?
 {¶ 155} "A. Yes."
 {¶ 156} During closing arguments, the prosecutor again referred to L.S. crying when she talked to the counselor about the incident. However, L.S. did testify on direct examination that "what had happened, someone told me that it did not happen and I just needed to get over it so we can all hang out again, and then I got upset and then I ended up telling one of my old counselors." "Upset" can be defined as "[t]o distress mentally or emotionally." Webster's II New College Dictionary (1995) 1213. When L.S. testified that she told the counselor because she was upset, it was not unreasonable for the prosecutor to later suggest that she told the counselor because she was crying. We conclude that the prosecutor's reference to L.S. crying was not unreasonable.
 {¶ 157} Richmond's First Assignment of Error is overruled.
 III {¶ 158} Richmond's Second Assignment of Error is as follows:
 {¶ 159} "APPELLANT WAS DENIED A FAIR TRIAL, DUE PROCESS, AND HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 160} Richmond incorporates his arguments contained in his First Assignment of Error, contending that his counsel was ineffective in failing to object to the prosecutor's improper remarks.
 {¶ 161} We evaluate claims of ineffective assistance of counsel under the two-part test provided in Strickland v.Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. "In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness and that, but for counsel's errors, the result of the proceeding would have been different." State v. Stevens, Montgomery App. No. 19572,2003-Ohio-6249, at ¶ 33, citing Strickland, supra; State v.Bradley (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373.
 {¶ 162} We have overruled Richmond's First Assignment of Error upon the grounds that: (1) some of the prosecutor's comments were not improper; (2) improper comments that were objected to were not sufficiently prejudicial; and (3) the improper comments that were not objected to did not rise to the level of plain error, because the result of the trial would not clearly have been otherwise, had they not occurred. Only the third category of prosecutor's comments are material to Richmond's ineffective assistance of counsel argument.
 {¶ 163} The prejudice required for ineffective assistance of counsel is somewhat less than that required for plain error. Ineffective assistance justifies reversal if there exists "a reasonable probability that, were it not for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Bradley,
supra, at 142, quoting Strickland, supra, at 694.
 {¶ 164} Our assessment of whether the prejudice prong ofStrickland v. Washington, supra, is met by defense counsel's failure to have objected to many of the improper statements made by the assistant prosecutor, which are discussed in Part II, above, is a very close call in this case. While each particular improper statement falls distinctly short, in our view, of creating a probability of a different outcome sufficient to undermine confidence of the outcome, we must consider the cumulative effect of all of the unobjected to misstatements. We conclude that, even when considered cumulatively, they fall just short of the Strickland prejudice standard. In reaching this conclusion, we are guided by the fact that all of the misstatements, while clearly material, involved matters that were collateral to the actual evidence of guilt, and, even more importantly, by the fact that the proof of Richmond's guilt, while not overwhelming, was straightforward and strong. This proof included the testimony of the victim, L.S., the corroborating testimony of Grooms, which included his admission, against his penal interest, that he was an actual participant in the sexual assault against L.S., and Richmond's failed polygraph examination. While L.S. may have been under the influence of alcohol at the time of the incident, she never wavered in her assertion that Richmond sexually assaulted her. Grooms's corroborating testimony is especially credible in view of the fact that in it, he incriminates himself, notwithstanding that the victim, L.S., never asserted that he was an active participant in the sexual assault upon her. Finally, the polygraph examiner, Erwin, while admitting that no polygraph examination is one hundred per cent reliable, was unequivocal in her opinion that Richmond was deceitful when he denied the assault. The combination of the testimony of L.S., Grooms, and Erwin establishes a strong case against Richmond.
 {¶ 165} It is common to think of the strength of evidence of guilt as having just three possible values: (1) insufficient — where the evidence is too weak to permit a reasonable finder of fact to find guilt beyond a reasonable doubt; (2) sufficient, but not overwhelming — the normal range, where there is sufficient evidence to permit a finding of guilt beyond reasonable doubt, but the evidence is not so overwhelming as to render harmless error in the proceedings that would normally be prejudicial; and (3) overwhelming — where the evidence of guilt is so strong that errors in the proceedings that would normally merit reversal are ignored as harmless. In our view, this is too simplistic. In reality, there is a spectrum of proof. In the range of that spectrum where the evidence is sufficient, the stronger the evidence is, the more prejudicial error can be and still be ignored as harmless. In a close case, it may not take much prejudicial error to merit reversal; in a stronger case, more prejudice is required, and so on, until, in an overwhelming evidence case, almost no error other than error affecting the existence of the overwhelming evidence, or structural error, will merit reversal.
 {¶ 166} Because we conclude that the evidence against Richmond in this case is strong, we conclude that the unobjected to misstatements by the assistant prosecutor are not so prejudicial as to have undermined confidence in the outcome of the trial. But we emphasize that this is a close call in this case, and we encourage the Greene County Prosecutor's office to be more scrupulous, in future cases, in conforming comments in closing argument to the evidence admitted at the trial.
 {¶ 167} Richmond also contends that his defense counsel was ineffective in failing to object to Detective Walton's testimony that Grooms did not know about L.S.'s statement at the time he came forward. Richmond contends that defense counsel's failure to object left the impression on the jury that L.S. and Grooms independently corroborated each other's statements.
 {¶ 168} The prosecutor did ask Detective Walton, "Did Eric know about [L.S.'s] statement at the time he came forward?" Detective Walton responded, "No, he did not." Defense counsel did not object to this question. However, on cross-examination defense counsel asked Detective Walton the following:
 {¶ 169} "Q. Detective, you didn't talk to anyone or get any statements until November of 2004, correct?
 {¶ 170} "A. That's correct.
 {¶ 171} "Q. Okay. And you don't know if Eric and [L.S.] had talked from the time of June 2004 until November of 2004, that's also correct?
 {¶ 172} "A. That is correct, sir.
 {¶ 173} "Q. So you don't know what is going on between them?
 {¶ 174} "A. No, I do not."
 {¶ 175} We conclude that defense counsel was not ineffective in failing to object to Detective Walton's testimony that Grooms did not know about L.S.'s statement at the time he came forward, given that defense counsel clarified in cross-examination that Detective Walton did not know if L.S. and Eric had talked before Grooms gave him his statement.
 {¶ 176} Richmond also contends that defense counsel was ineffective in failing to object to hearsay evidence regarding rumors circulating in the community about the incident.
 {¶ 177} On cross-examination, the prosecutor asked Minnix the following:
 {¶ 178} "Q. Okay. Now, let me ask you this: When did you find out that the Defendant was charged with performing oral sex on a 15-year-old child?
 {¶ 179} "A. I just heard hearsay about it on the following week.
 {¶ 180} "Q. The following week of what, ma'am?
 {¶ 181} "A. The supposed incident happened on a Saturday, and then it was that next week and, like I said, the only thing I heard was hearsay.
 {¶ 182} "Q. Okay. All right. So you heard hearsay about it?
 {¶ 183} "A. Exactly."
 {¶ 184} On re-cross examination, the prosecutor asked Minnix:
 {¶ 185} "Q. Yes, ma'am. Forgive me for asking this, but didn't you just tell the ladies and gentlemen of the Jury that you did hear that your boyfriend or ex-boyfriend had been charged because there was a rumor going around that he had been charged with sexually assaulting [L.S.]? Didn't you tell me that you just heard that within the week, or is that not the case now?
 {¶ 186} "* * *
 {¶ 187} "Q. Within that week, did you or did you not know that the Defendant was in trouble for allegedly having performed oral sex on a 15-year-old girl? Did you know that within a week?
 {¶ 188} "A. I didn't know that there was any trouble. I just thought it was hearsay, rumors. There was nothing said about trouble."
 {¶ 189} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Minnix's testimony that she heard about the incident through rumors a week after the incident occurred was not offered for the truth of the matter asserted — i.e., that the incident actually occurred — but was offered instead to explain when she became aware of the incident. We conclude that Minnix's testimony is not inadmissible hearsay. Therefore, we conclude that defense counsel was not ineffective in failing to object.
 {¶ 190} Richmond also contends that defense counsel was ineffective in failing to object to Cynthia Erwin's testimony that a second polygraph examiner, who did not testify at trial, reviewed Richmond's polygraph tests and concluded that Richmond was being deceptive.
 {¶ 191} Cynthia Erwin testified that in a stipulated polygraph, the test results are examined by a second examiner to make sure that the conclusion rendered is as accurate as possible. Erwin testified that the second examiner reached the same conclusion as she did. In closing arguments, the prosecutor explained the process Erwin used in reaching her conclusion. He explained that Erwin reaches her conclusion by reviewing three tests taken by the examinee, and then having a second examiner review the same three tests.
 {¶ 192} Erwin's testimony was focused on how she reached her conclusion in a stipulated polygraph. Part of the process in a stipulated polygraph is to have a second examiner review the same three tests reviewed by Erwin so that Erwin's conclusion is as accurate as possible. Richmond has failed to demonstrate how he was prejudiced by Erwin's testimony regarding the process used to reach her conclusion. We conclude that defense counsel was not ineffective in failing to object.
 {¶ 193} Richmond's Second Assignment of Error is overruled.
 IV {¶ 194} Richmond's Third Assignment of Error is as follows:
 {¶ 195} "THE TRIAL COURT ERRED THROUGH MAKING ERRONEOUS EVIDENTIARY RULINGS."
 {¶ 196} When Richmond objected to the prosecutor's closing argument regarding Sams's statement to Detective Walton, Richmond contends that the trial court erred in merely instructing the jury that closing argument is not evidence and that the jury must rely on the evidence presented in the case to determine the facts.
 {¶ 197} When the prosecutor referenced Sams's statement to Detective Walton during closing arguments, defense counsel objected, pointing out that Sams did not testify. The prosecutor argued that Detective Walton testified that he took a statement from Sams. Defense counsel did not assert that Detective Walton had not testified concerning Sams's statement. The trial court instructed the jury that closing argument is not evidence and that the jury must rely on the evidence presented in the case to determine the facts. The prosecutor then went on to discuss Sams's statement. At this point, defense counsel should have objected again if he was dissatisfied with the trial court's instruction and the prosecutor's further discussion of Sams's statement. However, we have already concluded that Richmond was not prejudiced by the prosecutor's improper comments regarding Sams's statement.
 {¶ 198} Richmond also contends that the trial court erred in overruling his objection to the prosecutor's question regarding whether Minnix had heard Richmond had been charged through rumors circulating within the community within a week after the incident. Richmond contends that Minnix did not testify that she had heard that Richmond had been charged, and that the prosecutor misconstrued her testimony. However, the prosecutor had previously asked Minnix the following:
 {¶ 199} "Q. Okay. Now, let me ask you this: When did you find out that the Defendant was charged with performing oral sex on a 15-year-old child?
 {¶ 200} "A. I just heard hearsay about it on the following week."
 {¶ 201} Therefore, we conclude that the trial court did not err in overruling Richmond's objection.
 {¶ 202} Richmond's Third Assignment of Error is overruled.
 1. V {¶ 203} Richmond's Fourth Assignment of Error is as follows:
 {¶ 204} "THE TRIAL COURT ERRED IN IMPOSING A SENTENCE FOR A REASON THAT IS CONTRARY TO LAW, THEREBY VIOLATING APPELLANT'S CONSTITUTIONAL RIGHTS AND SUBJECTING HIM TO AN UNFAIR SENTENCE."
 {¶ 205} Richmond contends that the trial court erred in basing his sentence on his cousins' involvement in the incident.
 {¶ 206} At Richmond's sentencing hearing, the trial court stated as follows:
 {¶ 207} "THE COURT: A Jury of your peers has decided that you committed these offenses. This Court presided over this trial. I am very familiar with the facts. I'm familiar with the circumstances of the young lady, this teenager that was involved in this particular case, and what I can only consider the vile acts that you committed when she was basically in a state in which she couldn't adequately take care of herself.
 {¶ 208} "I have the upmost sympathy to your family because you have caused them great difficulty. My responsibility, as I've indicated, pursuant to that law is for the purpose of imposing a disposition and a sentence in this case which is consistent with these purposes and principles of sentencing.
 {¶ 209} "Frankly, I consider one of the most, I guess you could say, difficult cases for any victim is one who has to testify, particularly a teenager, in a sexual assault case and I have nothing that I found in this presentence investigation which mitigates the impact that has occurred to this young lady and also the act that you committed in this case that compels this Court to impose a prison sentence in this case.
 {¶ 210} "* * * [T]he Court obviously notes that this is a sex offense and, as I believe the Prosecutor has pointed out on the record once already, you do have a record of imprisonment two previous times from Greene County, one for Breaking and Entering and one for Illegal Conveyance of a Drug of Abuse on the Grounds of a Detention Facility.
 {¶ 211} "* * *
 {¶ 212} "The Court is somewhat disturbed by the fact, I think essentially based upon the evidence presented in this case, that there may be other individuals who were involved in virtually the same kind of conduct that you were involved in, and I hold no good for those particular individuals, but they're not before me at this time and there's nothing I can do about that, but I do take that into consideration in the disposition in this case.
 {¶ 213} "The Court finds that based upon your prior history and the fact you've been to prison two previous times, this is your third felony offense in this county, that prison is consistent with the purposes and principles of sentencing and that you are not amenable to community control sanctions.
 {¶ 214} "* * * I've already pointed out the fact that you have previously served a term of imprisonment, and that the shortest prison term will demean the seriousness of your conduct. What I mean by that is, a sexual assault of any form against a teenager, I cannot emphasize how significant that is upon that human being, and to take advantage of the human being under the circumstances of which she was and obviously the impact that I saw it had upon her and here today, indicates to this Court that the shortest prison term would, in fact, demean the seriousness of your conduct.
 {¶ 215} "And, further, the Court finds that it would not protect the public from future crime by you or others, and what I mean by that is that with being in prison on two previous occasions and taking the opportunity in this case, the Court is of the opinion that the shortest prison term will not be appropriate in this case."
 {¶ 216} The trial court then sentenced Richmond to four years of imprisonment for Sexual Battery and four years of imprisonment for Unlawful Sexual Conduct with a Minor, to be served concurrently.
 {¶ 217} The record shows that the sentence the trial court imposed upon Richmond was based on far more than just his cousins' involvement with the incident. The trial court emphasized that Richmond's prior history including two prison terms as well as the age of the victim and the impact of the crime upon the victim formed the basis of the sentence. We conclude that the trial court did not err in its sentencing.
 {¶ 218} Richmond's Fourth Assignment of Error is overruled.
 VI {¶ 219} Richmond's Fifth Assignment of Error is as follows:
 {¶ 220} "THE TRIAL COURT ERRED IN PROVIDING A FAULTY JURY INSTRUCTION."
 {¶ 221} Richmond contends that the trial court erred in its jury instruction regarding the polygraph test. Richmond contends that the trial court failed to instruct the jury in accordance with the following guideline set forth in State v. Valdez
(1962), 91 Ariz. 274, 283-284, 371 P.2d 894, 900, and adopted by the Supreme Court of Ohio in State v. Souel (1978),53 Ohio St.2d 123, 132, 7 O.O.3d 207, 372 N.E.2d 1318, that where a polygraph test is admitted "`the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate that at the time of the examination defendant was not telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given.'"
 {¶ 222} In this case, the trial court instructed the jury as follow:
 {¶ 223} "The results of a polygraph examination have been admitted into evidence. The results obtained from the polygraph examination are not admitted to prove or disprove any element of the offenses with which the Defendant is charged. Rather, the testimony is admitted to indicate at the time of the examination the Defendant was not telling the truth. You may consider this testimony for the purpose of corroboration or impeachment of the witnesses who testified in this case for the purpose of testing their credibility."
 {¶ 224} The trial court further instructed the jury, "You are the sole judges of the facts, the credibility of the witnesses and the weight to be given to the evidence." The trial court instructed, "You may believe or disbelieve all or any part of the testimony of any witness. It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief."
 {¶ 225} We conclude that the trial court complied with the guideline set forth in Valdez, supra, and adopted by the Supreme Court of Ohio in Souel, supra. We conclude that the trial court did not err in its jury instruction regarding the polygraph test.
 {¶ 226} Richmond's Fifth Assignment of Error is overruled.
 VII {¶ 227} Richmond's Sixth Assignment of Error is as follows:
 {¶ 228} "THE CUMULATIVE EFFECT OF THE ERRORS OCCURRING AT TRIAL DEPRIVED APPELLANT OF A FAIR TRIAL."
 {¶ 229} Richmond contends that even if the isolated errors during trial did not rise to the level of prejudicial error, the cumulative effect of the errors deprived him of a fair trial.
 {¶ 230} Although Richmond's trial was not without error, none of the errors that we have identified were prejudicial to him. Numerous harmless errors may cumulatively deprive a defendant of a fair trial and thus may warrant the reversal of his conviction.State v. DeMarco (1987), 31 Ohio St.3d 191, 31 OBR 390,509 N.E.2d 1256, paragraph two of the syllabus. For the reasons set forth in Part III, above, upon a complete review of the record, we conclude that even considered cumulatively, the error we have found in this case is not sufficiently prejudicial to merit reversal.
 {¶ 231} Richmond's Sixth Assignment of Error is overruled.
 VIII {¶ 232} All of Richmond's assignments of error having been overruled, the judgment of the trial court is Affirmed.
Grady, P.J., and Wolff, J., concur.